IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA      :
                              :
            v.                :   CRIMINAL ACTION NO.
                              :   1:19-CR-0184-MHC-JSA
JIM C. BECK                   :

## REPORT AND RECOMMENDATION

The bar in Georgia, as in most states, restricts lawyers from contacting others who are represented by counsel. *See* Ga. R. Prof. Conduct 4.2(a). Although no controlling precedent has been issued by the Eleventh Circuit or Georgia's appellate courts, many other courts have found that such "no-contact" rules allow legitimate, covert, criminal investigative activities prior to a formal charge. The Defendant now asks this Court to defy the great weight of this caselaw, and sound policy, and declare the Government's use of a cooperating informant prior to indictment in this case to be unethical and illegal. Defendant thus requests suppression of his statements to this informant, and disqualification of the prosecutors and agents working on this case. *See* Def.'s Am. Mot. and Mem. to Disqualify Counsel and to Suppress Statements [33] ("Motion").

The Court, however, finds the significant weight of the caselaw to be correct, and that neither Georgia's ethics rules nor any other authority cited by Defendant prohibited the pre-indictment, non-custodial, and covert investigative contacts at

issue in this case. The Court also finds that, if there were a violation, suppression or disqualification would not be the appropriate remedies. The Court thus **RECOMMENDS** that the Motion [33] be **DENIED**.

## I.      BACKGROUND

In or about June 2018, Defendant asserts that he became aware that a grand jury in this District had issued a subpoena to the Georgia Underwriting Association ("GUA"), an organization for which Defendant had served as General Manager. The subpoena was not attached to any motion papers, but Defendant asserts that it sought documents related to his employment at GUA, including his personnel, employment, time sheet, compensation, disciplinary history, and ethics record. Mot. [33] at 2. The subpoena also sought copies of Defendant's Financial Disclosure Statements, Requests for Permission to Perform Outside Employment forms, Employee Ethics Pledges, and related documents. *Id*.

After becoming aware of the subpoena, the Defendant retained counsel William H. Thomas, Jr. to "represent him in the criminal investigation." *Id*. at 2. On June 28, 2018, Defendant asserts that Mr. Thomas contacted the Assistant United States Attorney listed on the subpoena and "advised her of his representation of Mr. Beck." *Id*. at 3. Mr. Thomas documented the conversation in a letter that he sent to the prosecutor on July 16, 2018, which letter is attached as Exhibit A to the Motion. In relevant part, the letter states:

> In our conversation … [y]ou advised that [Mr. Beck] is the subject of an investigation as that term is defined by the United States Attorney's Manual.
>
> On a related note, and as we discussed in our conversation, I am not aware of any facts about Mr. Beck that would give rise to any criminal liability … If the Government is willing to disclose the facts and circumstances which have apparently given rise to this matter, Mr. Beck is willing to address that through counsel.

Mot., Exh. A [33-1].

Defendant alleges that several months after this letter, on or about December 19, 2018, agents of the Federal Bureau of Investigation ("FBI"), acting at the prosecutors' direction, surreptitiously recorded conversations between Defendant and a cooperating witness referred to in the Indictment as "M.B." Mot. [33] at 3. Allegedly, M.B. told the Defendant that the FBI had requested to speak with M.B., although this was allegedly a ruse designed by the prosecutors and/or agents to see if Defendant would say something incriminating in response. *Id*. at 3–4. Defendant denies doing so. *Id*.

## II.   DISCUSSION

A.   *Applicability of Georgia's No-Contact Rule to Covert, Pre-Indictment Investigative Activities*

Georgia Rule of Professional Conduct 4.2(a) provides in relevant part that:

A lawyer who is representing a client in a matter shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or court

3

order.

Ga. R. Prof. Conduct 4.2(a). This rule is substantively identical to the American Bar

Association's model "no-contact" rule, which also bears the number 4.2:

> In representing a client, a lawyer shall not communicate about the
> subject of the representation with a person the lawyer knows to be
> represented by another lawyer in the matter, unless the lawyer has the
> consent of the other lawyer or is authorized to do so by law or a court
> order.

Model Rules of Prof. Conduct r. 4.2 (Am. Bar Ass'n 2016).

The commentary to Georgia's Rule 4.2 provides an important exception for

certain law enforcement activities. The commentary states that, among the

communications that are considered "authorized by law," and therefore outside of

the prohibitions of the no-contact rule, are:

> [C]onstitutionally permissible investigative activities of lawyers
> representing governmental entities, directly or through investigative
> agents, prior to the commencement of criminal or civil enforcement
> proceedings, when there is applicable judicial precedent that either has
> found the activity permissible under this Rule or has found this Rule
> inapplicable.

Ga. R. Prof. Conduct 4.2(a), cmt. [2].

The Government does not cite, and the Court is not aware of, published

authority from the Eleventh Circuit or any state appellate court in Georgia that has

considered whether pre-indictment, covert criminal investigative activities are

authorized for purposes of Rule 4.2.

However, at least one Georgia Superior Court Judge, and many other federal courts, have considered the question under identical or similar versions of this rule or its precursors, and nearly all have found such conduct to be permissible. *Georgia v. Dorsey*, No. 02CR1519-6 (Super. Ct. Dougherty Cty. June 1, 2002) (Becker, J.) (Slip op.) (attached to Gov't Resp. as [37-2] at 2–8) (prosecutors permissibly used a witness to contact a Defendant known to be represented in a corruption investigation, and ask "what are we going to do?"; although incident occurred prior to enactment of Rule 4.2, the Court noted that "interpretation of disciplinary rules whether 4.2 or the precursor barring certain conduct by attorneys does not necessarily bar legitimate investigative techniques in conducting or supervising criminal litigation."). *See United States v. Carona*, 660 F.3d 360, 364–65 (9th Cir. 2011) (prosecutors permissibly directed an informant to discuss his supposed receipt of a subpoena with a represented suspect, noting that "our cases have more often than not held that specific instances of contact between undercover agents or cooperating witnesses and represented suspects did not violate" California's rule); *United States v. Heinz*, 983 F.2d 609, 614 (5th Cir. 1993) (applying the no-contact rule to ordinary pre-indictment criminal investigation techniques would "severely alter investigative operations in all criminal cases, except those investigations focused on run-of-the-mill criminals who cannot afford lawyers."). *See also United States v. Binday*, 804 F.3d 558, 593 (2d Cir. 2015) ("Prior to indictment … the government is 'authorized

by law' … 'to employ legitimate investigative techniques in conducting or supervising criminal investigations,'" including using informants); *United States v. Cope*, 312 F.3d 757, 773–74 (6th Cir. 2002). *Cf. United States v. Koerber*, 966 F. Supp. 2d 1207, 1232 (D. Utah 2013) (finding a violation based only on an express, overt communication from counsel to a represented person, but otherwise reaffirming that "*covert* or *undercover* noncustodial, pre-indictment *ex parte* contact by law enforcement personnel in the investigative phase of a matter is 'authorized by law' for purposes the no-contact rule," based on "extensive progeny in many jurisdictions.") (citations omitted) (emphasis in original).

The exceedingly few cases cited by Defendant that have found or suggested potential violations by criminal prosecutors for pre-indictment conduct, have done so in the context of ***overt, direct*** contacts, by prosecutors themselves and/or law enforcement agents directed by them. *See United States v. Curious Goods, L.L.C.*, No. 12-00146-(06), 12-00146-(08), 2014 WL 345235, at *8 (W.D. La. Jan. 28, 2014) (interviewing represented Defendant through law enforcement *after* indictment, about forfeiture issues that were not yet charged but related to the pending criminal case); *Koerber*, 966 F. Supp. 2d at 1232 (interviewing a represented suspect by law enforcement without contacting counsel); *United States v. Tapp*, No. CR107-108, 2008 WL 2371422 (S.D. Ga. June 4, 2008) (issuing subpoena to and examining a represented suspect before the grand jury without contacting counsel). Indeed,

*Koerber*, a case upon which Defendant strongly relies, expressly distinguished the

overt nature of the contact at issue in that case from covert contacts such as through

undercover informants because, "[a]s noted several times already, undercover or

overt contact with represented individuals remains a 'well-established investigatory

technique' and as such is 'authorized by law.'" 966 F. Supp. 2d at 1233 n.14.[1]

---

[1] There are other reasons why *Koerber* and *Tapp*, which appear to be Defendant's principal authorities, are unpersuasive or unhelpful. As for *Koerber*, that opinion was repudiated by a later ruling in what was essentially the same case. The case was dismissed without prejudice, re-indicted, and assigned to a new judge, who expressly refused to accept and apply *Koerber*, because the legal conclusions "demonstrate clear error." *See United States v. Koerber*, No. 2:17-CR-37-RJS-PMW, 2017 WL 3172809, at *4 (D. Utah July 25, 2017) ("*Koerber II*") ("Judge Shelby held that the legal conclusions in the Suppression Order do not bind this court. Furthermore, Judge Shelby declined to accept Judge Waddoups' findings that a Rule 4.2 violation occurred, that it constituted a due process violation, and that suppression was warranted. Therefore, the Suppression Order does not provide this court a basis to disqualify Mr. Walz or any other member of the prosecution team."); *id.* at *5 ("Judge Shelby has held that the Suppression Order's legal conclusions demonstrate clear error.").

As for *Tapp*, that decision by then-Chief Judge Moore of the Southern District of Georgia merits careful consideration, because it is the only federal case in Georgia cited by the parties as to the applicability of Rule 4.2 on pre-indictment criminal conduct. Judge Moore also offers a thoughtful and detailed history of the no-contact rule and the reasons why historical arguments by the Department of Justice to exempt its attorneys altogether from the rule's coverage were meritless. But the case is factually distinguishable because it involved direct, overt contacts. Moreover, in the end, the Court did not expressly find a violation, but rather only stated that the prosecutor's conduct was a "bad practice," and "ill-advised." 2008 WL 2371422 at *19–20. Indeed, the existence of a violation appeared to be moot, because the original prosecutor had already withdrawn from the case, and the Court found the

The distinction between overt or express lawyer or law enforcement contact, and *covert* or *undercover* contacts such as through a secretly-cooperating informant, is important. The latter typically involves merely "engaging in a conversation with an individual [that a suspect] believed to be his ally against the prosecution." *See Carona*, 660 F.3d at 366. In such situations, suspects are more likely to feel like they are in their own comfort zone, less likely to feel intimidated by a power imbalance with a lawyer, and less likely to be subject to "artful" interrogation by a lawyer (or a lawyer's agent). *See id.*

There are additional strong policy reasons for not applying the no-contact rule to legitimate, covert criminal investigation techniques. "It would be antithetical to the administration of justice to allow a wrongdoer to immunize himself against such undercover operations simply by letting it be known that he has retained counsel." *Id.*; *United States v. Fitterer*, 710 F2d. 1328, 1333 (8th Cir. 1983) ("[W]e do not believe that [Minnesota's no-contact rule] was intended to stymie undercover operations when the subject retains counsel."). Not only would such "immunity" thwart legitimate criminal investigations, but it would be a highly unequal protection, available only to those suspects wealthy enough to be able to hire a

---

"alleged" misconduct would have been insufficient to justify the only other requested relief (dismissal). *Id.*

private attorney prior to any formal charge. *See Heinz*, 983 F.2d at 614 (applying no-contact rule to pre-indictment, covert techniques would "severely alter investigative operations in all criminal cases, except those investigations focused on run-of-the-mill criminals who cannot afford lawyers.")

Defendant argues that the Government's actions in this case should not be considered "covert" investigation, because the informant's calls with Defendant occurred several months after the last date of any criminal act later charged in the Indictment. Defendant concludes from this timing that the investigators "were not attempting to investigate ongoing criminal activities," but rather were only investigating historical activities and/or seeing if Defendant would engage in new acts of obstruction. Def. Reply. Br. [41] at 13. This distinction is immaterial. First, simply because the indictment did not ultimately charge criminal activity during the timeframe of these covert calls does not mean that the Government was not investigating such potential activity. Second, Defendant cites no cases drawing a distinction between covert, pre-indictment investigation of ongoing versus historical criminal activity. The cases, rather, principally focus on whether the contacts were in the investigative (pre-indictment) phase of the case, and whether the Government's approach to the suspect was overt or covert. The timing of the investigation vis-à-vis the criminal activity being investigated is not a fact upon which the applicability of Rule 4.2 is deemed to turn, at least not in any case cited

by Defendant. To the contrary, the cases approve covert, informant contacts even about purely historical events. *See, e.g.*, *Carona*, 660 F.3d at 363 (prosecutors did not run afoul of California's no-contact rule by directing informant to talk to a represented suspect, in 2007, to say that he (the informant) had been subpoenaed to produce records relating to a corrupt purchase of a speedboat for the suspect back in 2001).

To be sure, some of the precedents discussed above considered previously-applicable language of Rule 4.2 or precursor rules, which covered contacts with "parties," as opposed to a "persons," known to be represented. Some precedents found that the word "party" implied the existence of formal litigation, and that this wording was one reason not to apply the no-contact rule before indictment. *See, e.g.*, *United States v. Ryans*, 903 F.2d 731, 739 (10th Cir. 1990). Obviously, such a rationale would not apply to a rule, such Georgia's current Rule 4.2, that protects represented "persons" and not just "parties."

Nevertheless, not all precedents involved local rules that applied just to represented "parties." *See, e.g.*, *Heinz*, 983 F.2d at 613–14, 618 n.4 (finding that Texas's ethics rule barring a lawyer from contacting any "*person*, organization or entity of government the lawyer knows to be represented by another lawyer regarding that subject [of representation]," did not bar pre-indictment covert contacts by an informant) (emphasis added). *See also United States v. Isch*, No. CR-09-040-

D, 2009 WL 2409548, at *1–2 (W.D. Okla. Aug. 3, 2009) (finding that Oklahoma's Rule 4.2, which provided "a lawyer shall not communicate about the subject of the representation with a *person* the lawyer knows to be represented by another lawyer in the matter," did not prohibit pre-indictment covert investigative contacts, to wit, the prosecutors' use of an informant to engage in recorded conversations with a suspect) (emphasis added). *Cf. Koerber*, 966 F. Supp. 2d at 1232 (applying a version of Rule 4.2 that had been amended to apply to "represented person[s]," rather than "parties," and yet noting that "that *covert* or *undercover* noncustodial, pre-indictment *ex parte* contact by law enforcement personnel in the investigative phase of a matter is 'authorized by law' for purposes the no-contact rule.") (emphasis in original).

Other cases even involving versions of the rule using the word "party" or "parties" clearly did not rely on this wording in approving pre-indictment, covert investigative activities. Indeed, several cases acknowledged that Rule 4.2 applies prior to the initiation of formal litigation, despite any use of the word "party," but that covert criminal investigative steps are nevertheless authorized by law.

For example, although the California rule at issue in *Carona* referred, at the time, to "represented *parties*," the Ninth Circuit rejected any bright-line by which the rule would be inapplicable prior to formal charges. *See* 660 F.3d at 364 (emphasis added). Rather, *Carona* found that the rule covered pre-indictment conduct, but that

the use of a covert informant in that case was authorized, because the Court "'agreed with the majority of courts which have considered the question that [the no-contact rule] was not intended to preclude undercover investigations of unindicted suspects merely because they have retained counsel.'" *Id*. at 365 (quoting *Ryans*, 903 F.2d at 739); *United States v. Ward*, 895 F. Supp. 1000, 1006 (N.D. Ill. 1995) (assuming, without deciding, that Illinois' then-current Rule 4.2 applied to pre-indictment conduct despite its reference to "represented parties," nevertheless denying relief because "undercover taping of suspects during the investigatory stage of criminal proceedings is precisely the kind of legitimate investigatory tactic that [even courts that have found violations have] found permissible.").

Notably, Defendant has cited no case that has found a Rule 4.2 violation in the context of pre-indictment covert contacts by an informant or undercover agent. One case that found such a violation, although not cited by Defendant, is *United States v. Hammad*, 858 F.2d 834, 839–42 (2d Cir. 1988). In that case, the Second Circuit re-affirmed that prosecutors are generally "'authorized by law' [under New York's no-contact rule] to employ legitimate investigative techniques in conducting or supervising criminal investigations, and the use of informants to gather evidence against a suspect will frequently fall within the ambit of such authorization." *Id*. at 839–40. Nevertheless, in *Hammad*, the court found prosecutors to have violated the rule based on the specific facts presented, to wit, where the prosecutors fabricated a

false grand jury subpoena purportedly addressed to an informant, and then directed the informant to discuss his receipt of that subpoena with the later-indicted suspect. *Id*. at 839–42. In reaching this decision, the court appeared to be heavily influenced by the prosecutors' use of falsified judicial process as an aggravating and exceptional factor. *Id*. The court's analysis does not suggest that it would have reached the same result absent such circumstances. To the contrary, as noted above, the court itself remarked that the use of informants prior to indictment "will frequently" be considered as authorized conduct. *Id*. These remarks distinguish *Hammad* from the case at bar, which does not involve falsification of subpoenas or other judicial process.[2]

In any event, *Hammad* does not assist Defendant for another more basic reason. Despite finding a violation of the no-contact rule, the Second Circuit reversed the district court's order of suppression. Having noted that most cases involving pre-indictment covert contacts find no violation, *Hammad* found that "the

---

[2] It is also notable that other courts presented with this same scenario have rejected *Hammad*'s conclusions about the improper nature of using a fake subpoena, at least where the recipient of the purported subpoena was in on the ruse. In *Carona*, the prosecutors "provided the informant with fake subpoena attachments to use in getting [the represented suspect] to incriminate himself." 660 F.3d at 364–65. Yet the Ninth Circuit expressly rejected *Hammad* and found that the use of fake subpoenas as a "prop" or "stratagem" still constituted an ordinary pre-indictment approach by a covert informant. *Id*. at 364–66. Thus, the court found the conduct to be subject to the "authorized by law" exception to the no-contact rule.

government should not have its case prejudiced by suppression of its evidence when the law was previously unsettled in this area. Therefore, in light of the prior uncertainty regarding the reach of [New York's no-contact rule], an exclusionary remedy is inappropriate in this case." *Id*. at 842.

While the amount of caselaw against Defendant's position is strong, it is true that none of this caselaw is controlling in this Court. Even *Dorsey*, as Defendant points out, is a mere trial court decision, not a published opinion by a Georgia appellate court. Thus, Defendant argues that although many courts elsewhere may have blessed pre-indictment informant activity, there is no "applicable judicial precedent" governing this Court's decisions on the specific issue of whether the activity is permissible under Georgia's version of rule 4.2. Without such "applicable judicial precedent," or a court order in this case, Defendant argues that the Court must consider the Government's activity to be illegal and unethical. Defendant also points out that although the Department of Justice's internal policy manual advises prosecutors that "[g]enerally, the case law recognizes covert contacts in non-custodial and pre-indictment situations as 'authorized by law,'" it also instructs them to focus on case law "in the particular jurisdiction in which they propose a contact with a represented person." Mot. [33] at 10. Here, Defendant argues, without previous controlling caselaw in this jurisdiction, it was illegal and unethical and

against Department policy for the Government to engage in informant activity with a represented suspect.

The term "applicable judicial precedent" appears in the commentary to Rule 4.2, not the rule itself. Ga. R. Prof. Conduct 4.2(a), cmt. [2]. Nevertheless, even assuming that this commentary should be strictly interpreted, the Court cannot ascribe to Defendant's interpretation of this term. Defendant appears to assume that this phrase refers only to controlling or binding decisions, but that is not what the text states. The rule simply refers to the term "precedent," which is defined as

1. Something of the same type that has occurred or existed before.

2. An action or official decision that can be used as support for later actions or decisions; esp., a decided case that furnishes a basis for determining later cases involving similar facts or issues.

Black's Law Dictionary (11th Ed. 2019).

Under the definition for the overall term "precedent" are definitions for various sub-terms, or types of "precedent," including "binding precedent," "declaratory precedent," "foreign precedent," "horizontal precedent," "original precedent," "precedent sub silentio," "superprecedent," "vertical precedent," and, perhaps most importantly here, "persuasive precedent." *Id.* The latter is defined as

A precedent that is not binding on a court, but that is entitled to respect and careful consideration.  For example, if the case was decided in a neighboring jurisdiction, the court might evaluate the earlier court's reasoning without being bound to decide the same way.

*Id.*

15

Thus, under the natural meaning of the phrase "applicable judicial precedent," the Court is not limited to binding decisions of the Supreme Court of the United States, the Eleventh Circuit, or Georgia's appellate courts. Rather, the Court can consider the overwhelming weight of the non-binding but persuasive caselaw from neighboring or other inferior jurisdictions dealing with the same or similar issues.

Indeed, Defendant's position would present something of a chicken-or-egg problem. According to Defendant, prior controlling precedent in a specific jurisdiction approving an undercover investigative technique must come first, prior to law enforcement engaging in that technique. But, by definition, no court could approve the technique without there being existing precedent. And there could be no existing precedent, if the technique is deemed to be illegal without it.

Any such interpretation of Rule 4.2 would render meaningless, or impossible, the reference to "applicable judicial precedent approving such activity." Ga. R. Prof. Conduct 4.2(a), cmt. [2]. The Court cannot agree that the drafters of the commentary intended to create such a paradox. *See United States v. Brown*, 595 F.3d 498, 516 (3d Cir. 2010) (rejecting the argument that an AUSA in Pennsylvania "ran afoul of Rule 4.2 because of the absence of a Pennsylvania statute or court decision expressly authorizing the conduct in which he engaged," where the conduct involved a "well-established investigatory technique," based on precedents from other jurisdictions,

and noting, "[a]fter all, the Pennsylvania courts have *not* held that such conduct is impermissible.") (emphasis in original).

Thus, while Georgia' no-contact rule applies to pre-indictment conduct by prosecutors, this Court finds persuasive the great majority of the cases that have found covert investigative contacts by informants to be within the "authorized by law" exception. Thus, the Court finds no violation based on the facts alleged here.[3]

### B.  *Other Sources of Authority*

Although Defendant primarily relies on the Georgia no-contact rule, his motion refers to various other ethical and legal standards. Generally, however, Defendant's reliance on these other standards merely piggy-back on, and presume

---

[3] The Government also contests knowing that Mr. Thomas's representation covered the subject matter of the informant contact in December 2018. Notably, Defendant does not provide any offer of proof as to what Mr. Thomas told any prosecutor as to the scope of his representation, and his letter provides little detail. In the letter, Mr. Thomas merely states, "if the Government is willing the disclose the facts and circumstances which have apparently given rise to this matter," that Defendant would answer questions through counsel. Mot., Exh. A [33-1]. Mr. Thomas's letter is akin to a suspect saying, "I don't know what you are investigating, but whatever it is, I am represented." The Court is uncomfortable with such a general and undefined assertion of representation as supposedly barring any subsequent covert investigation in the matter. Nevertheless, the Court finds it unnecessary to make any ultimate findings on this question because, even assuming that the prosecutors knew or should have known that Defendant was represented as to the subject matter of the informant contact, the contact was nevertheless "authorized by law" for purposes of Rule 4.2.

an underlying violation of, Rule 4.2. These citations therefore do not independently assist Defendant's motion.

Defendant refers to Georgia's Rule of Professional Conduct 3.4(g), which prohibits lawyers from using "methods of obtaining evidence that violate the legal rights of the opposing party or counsel." But, again, using surreptitious cooperating witnesses to communicate with a suspect is a well-established and generally legitimate criminal investigative technique. Thus, Defendant has not shown that the prosecutors violated his "legal rights" under Rule 4.2 or otherwise.

Defendant also cites internal Department of Justice policies. *See* Mot. [33] at 9–10 (citing to the Justice Manual § CRM 296 (2018)). But Defendant does not show that the "Justice Manual" purports to—or even could—expand his rights beyond what Rule 4.2 already provides. Indeed, according to Defendant's cites, the Manual simply alerts prosecutors to the ABA's Model Rule 4.2, directs them to be familiar with their local state's version of the rule and its commentary, and notes that, "[g]enerally, the case law recognizes covert contacts in non-custodial and pre-indictment situations as 'authorized by law.'" *Id*. At most, this language appears to direct prosecutors to comply with the no-contact rule in the jurisdiction in which they practice. Because the Court finds no violation by the prosecutors here in that regard, the citation to Department of Justice policy similarly fails.

Defendant next refers to a federal statute known as the McDade Amendment, 28 U.S.C. § 530B. This statute also does not "enlarge on the type of conduct that state rules forbid," but rather simply requires federal prosecutors to abide by the state ethics rules of the jurisdiction in which they practice. *United States v. Brown*, 595 F.3d 498, 516 (3d Cir. 2010). Thus, by definition, conduct that is permissible under Rule 4.2 does not independently violate the McDade Amendment. Further, the statute provides no specific remedies for a violation, and vests the Attorney General with rule-making power to assure compliance. 28 U.S.C. § 530B(b). The Attorney General's regulations expressly disclaim any case-related remedies, and state that violations "shall not be a basis for dismissing criminal or civil charges or proceedings or for excluding relevant evidence in any judicial or administrative proceeding." 28 C.F.R. § 77.5.

Finally, Defendant invokes the Fifth Amendment's Due Process clause. Defendant cites to *Koerber*, which relied in part on the Due Process clause as a basis to order suppression of the result of an unprofessional overt interview with a represented suspect. 966 F. Supp. 2d at 1235–45. Again, any reliance on *Koerber* is unhelpful, because the overt interview in that case is factually distinguishable from the covert contact here and because *Koerber II* repudiated *Koerber* as based on "clear error." *Koerber II*, 2017 WL 3172809 at *5.

In any event, the Court finds no violation of any law, policy or industry-based ethical standard, and so it follows that there was no Fifth Amendment violation. Even if one might debate the applicability of Rule 4.2 to the facts at bar, the issue is at the very least "unsettled," as the Second Circuit recognized in *Hammad*. *See* 858 F.2d at 842. Given the nearly universal caselaw authorizing legitimate, non-custodial, covert, pre-indictment investigative contacts, under various states' ethics rules, it cannot be said that a violation on the facts here (even if the Court were to find one) would be so flagrant as to run afoul of Due Process. *See generally United States v. Ofshe*, 817 F.2d 1508, 1516 (11th Cir. 1987) ("To constitute a constitutional violation the law enforcement technique must be so outrageous that it is fundamentally unfair and 'shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment.'") (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973)).

C.     *Appropriate Remedy*

As explained at length above, the undersigned finds no legal or ethical violation based on the covert pre-indictment contact in this case. In the alternative, even if there were a potential violation, the undersigned would nevertheless recommend denial of the relief requested by Defendant, that is, suppression and disqualification. As noted above, even *Hammad*, a rare example of a case finding a no-contact rule violation based on a pre-indictment covert communication, refused

to suppress any evidence. *See Hammad*, 858 F.2d at 842. *Hammad* recognized that the caselaw usually upholds such investigative activities and that the standards are at least "unsettled" as to the circumstances that can constitute a violation. *Id*. Thus, the court found that it would be unfair and ineffective to apply the exclusionary rule as a remedy. Such reasoning would apply here as well, even if a violation could be found.

For the same reasons, the court perceives no purpose in disqualifying counsel. Indeed, the court understands that the prosecutor with whom Mr. Thomas originally discussed his representation of Defendant has already left the U.S. Attorney's Office. Disqualifying the other remaining and/or new prosecutors would not seem to achieve any corrective purpose to the extent the evidence to which they are privy is not being suppressed. Also, disqualification would have limited deterrent value, and not constitute just punishment, based on conduct as to which the existing caselaw is at least "unsettled," if not strongly supportive of the legality of the prosecutors' actions. The Court thus finds nothing sufficient to warrant case-related sanctions, especially suppression.

## III.   RECOMMENDATION

Accordingly, the Court **RECOMMENDS** that Defendant's Motion [33] be

**DENIED**.

**IT IS SO RECOMMENDED** this 18th day of November, 2019.

_____

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE