IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CASE NO.  1:19-CR-184-MHC-JSA |
| JIM C. BECK | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION FOR  JUDGMENT OF  ACQUITTAL ON COUNTS 1-43 and BRIEF IN SUPPORT

COMES NOW Defendant, Jim C. Beck, by and through the undersigned counsel, and moves the Court pursuant to Federal Rule of Criminal Procedure 29 for a Judgment of Acquittal (the "Motion") on all counts in the Indictment, showing the Court as follows.

(1)   <u>Fraud Counts: Constructive Amendment / Variance.</u> The Court should acquit Mr. Beck on the wire and mail fraud charges in Counts 1-24 because, in two respects, the government's opening statement and presentation of evidence constructively amended the Superseding Indictment or amounted to a variance. *See* <u>United States v. Ward</u>, 486 F.3d 1212, 1226 (11th Cir. 2007) (citations omitted) (explaining the standards for constructive amendment and variance).

A.   <u>First Constructive Amendment / Variance: The Government Added a New Theory.</u> In its opening statement and and its presentation of evidence, the

1

government added a new and different theory of the case from the one set out in the Indictment. The theory alleged by the grand jury in the Indictment was that Mr. Beck's conduct was fraudulent because no property inspections or data scans were produced by Green Technology Services ("Green Tech") or Creative Consultants. In other words, no work was done. In its opening statement and presentation of evidence, however, the government asserted that the conduct was also fraudulent because there was not enough inspections or data scans done to justify the amount of the invoices. It therefore changed the issue to a question of the valuation of the work product. In so doing, the government altered the elements of its fraud counts, and broadened the bases for conviction beyond what is contained in the Indictment.

The Indictment, the government's pretrial filings, and the prosecution's statements to the media all made it clear prior to the trial that the government's theory was that Mr. Beck charged GUA for work that was not performed. The following is a partial list of statements contained in the Indictment:

Paragraph 9 claims that "Green Tech, which had no employees, existed only to produce fraudulent invoices, collect payment for fraudulent invoices, and redirect payments that it received to BECK through Creative Consultants." The clear import is that no work was done or procured. Paragraph 13 alleges that Matthew Barfield "incorrectly believed that other unidentified individuals were

performing the home inspections on behalf of Green Tech." The clear implication is that no home inspections were being done. Paragraph 19 contends that Mr. Beck "sent invoices from Creative Consultants to Green Tech that falsely and fraudulently stated that Creative Consultants had produced 'inspections,' 'data scans,' and 'Mitigation Services-Water Package' for Green Tech." The implication is, again, that work was not done.

The fact that this was the theory charged by the grand jury is further confirmed by the Motion in Limine filed by the government in this case on June 11, 2021 (Document 97 in the docket). That motion states as follows:

> Specifically, the superseding indictment alleges that Beck, using family and friends as straw owners, created fictitious companies to bill GUA hundreds of thousands of dollars <u>for work that had not actually been performed</u>.

*Id.* at 2 (emphasis added).

In its opening statement, however, the government added a new theory. In particular, the prosecution told the jury that they would hear from GUA employees who did "not recall ever seeing any work product from Green Tech at all, <u>let alone work product to justify the thousands of dollars of invoices paid by GUA</u> that ultimately ended up in Green Tech's bank account, and ultimately ended up in the defendant's bank account." *Id.* at 7 (lines 1-5 (emphasis added). In other words, the government presented a valuation theory, one premised on the concept that, while

3

property inspections and data scans may have been done, they did not justify the amount of money paid by GUA for the data produced.

After having raised the theory in its opening statement, the government then pursued it in its presentation of the evidence. In direct examination of GUA employee Josh Mosley, the prosecution asked Mr. Mosley to confirm that, if someone had paid $2 million for half a million data points, that would come out to roughly $4 per data point. The prosecutor then stated, or asked the witness to confirm, that that was "expensive."[1]

This addition of a new theory not contained in the Indictment constituted a constructive amendment, because it altered at least three elements of the offense. First, it altered the nature of the alleged misrepresentations: the invoices were no longer fraudulent because they charged for work that was not done, they were fraudulent because they charged too much for work that was done. Second, it altered the allegations about Mr. Beck's intent to defraud. The allegation is no longer just that Mr. Beck intended to send invoices to GUA for work that had not been performed; now the allegation is that he intended to send invoices to GUA for work that had been performed but didn't provide enough value to GUA to justify

---

[1]     The transcripts of the witness examinations are not yet available. As such, some quotations are based on Defendant's counsel's notes of the examination.

the amount paid. Third, in the same way it altered the nature of the scheme to defraud in which Mr. Beck is alleged to have participated.

Such a change in the theory of harm constitutes a constructive amendment, and it mandates acquittal. *See, e.g.*, United States v. Farr, 536 F.3d 1174 (10th Cir. 2008); United States v. Davis, No. 13-cr-923 (LAP), 2017 U.S. Dist. LEXIS 122643 (S.D.N.Y. Aug. 3, 2017) (finding a constructive amendment because "[i]n opening statements . . the Government added a new theory of economic harm").

In the alternative, this constituted a variance. Mr. Beck was substantially prejudiced by this change because, had the defense known that the issue at trial would not be whether any inspections or data scans were done, but instead whether the inspections and data scans that were done were of sufficient value to warrant the amount of payments made by GUA, the defense would have prepared its case differently. Among other things, the defense would have hired experts to present evidence on the valuation of the property inspections and data scans provided to GUA. Such evidence could have refuted the new contention that not enough work was done, and not enough value was provided for the amount paid per data point.

B.   Second Constructive Amendment / Variance: the Government Pursued an Invalid Honest Services Fraud Case. In addition, the government's presentation of evidence has morphed the case from one where the government is pursuing a

traditional, straightforward fraudulent invoice case to one where it is also seeking a conviction on the basis of an impermissible variation of an honest services theory.

The government may legally base a mail or wire fraud charge on an allegation that a defendant deprived a third party of the intangible right to honest services under 18 U.S.C. § 1346. No such allegation has been made in this case. The statute is not cited in the Indictment. In addition, no such allegation could be made in this case in light of Skilling v. United States, 561 U.S. 358 (2010), in which the Supreme Court held that the honest services fraud statute criminalizes only bribery and kickback schemes. The term "kickback" means "any money or compensation of any kind which is provided, directly or indirectly, to a contractor or contractor's employee, for the purpose of improperly obtaining or rewarding favorable treatment in connection with the contract." United States v. Aunspaugh, 792 F.3d 1302, 1307 (11th Cir. 2015). No such allegation has been made here.

Notwithstanding that, the government has asked its witnesses a number of questions designed to suggest that Mr. Beck deprived GUA, his employer, of the intangible right to his honest services. For example, the government asked witnesses from GUA about whether Mr. Beck was receiving a salary and was merely an employee of GUA, one not entitled to profit-sharing. During the direct examination of GUA board member John Houser, the government introduced

Exhibit 796, a document which specifically discussed Mr. Beck's salary and the Mr. Houser's recommendation to the board that that salary be increased. In addition, the government asked GUA witnesses if they believed that Mr. Beck had a conflict of interest. The effect of such questions was to establish for the jury that Mr. Beck was not entitled to compensation for providing property inspections and data scans, and that by receiving such payments he deprived GUA of the benefit of his honest services as an employee.

In light of Skilling, any such allegation or theory is legally impermissible without an allegation of a bribe or kickback, which is not alleged here. See also United States v. Goodrich, 871 F.2d 1011 (11th Cir. 1989) (noting that an argument that a victim paid salaries for services it did not receive was tantamount to an impermissible claim regarding the intangible right to honest services). By basing its evidence and arguments on contentions that alter the elements and broaden the basis for a possible conviction, the government has constructively amended the indictment. The fraud counts should be dismissed for this reason as well.

(2)    Failure to Prove Interstate Wires. Various of the wire fraud counts should be dismissed because the government failed to prove that the wire crossed state lines and therefore invoked federal jurisdiction. The related money laundering charges that are premised on these wire frauds also therefore necessarily fail.

The wire fraud statute at 18 U.S.C. § 1343 requires that the government prove that the communication at issue cross state lines. See, e.g., United States v. Ruan, 966 F.3d 1101, 1147 (11th Cir. 2020); United States v. Lietner, 555 Fed. Appx. 932, 938 (11th Cir. 2014); United States v. Ward, 486 F.3d 1212, 1222 (11th Cir. 2007); Boruff v. United States, 310 F.2d 918 (5th Cir. 1962); *but see* United States v. Jasen, 693 Fed. Appx. 801 (11th Cir. 2017) (per curiam) (appearing erroneously to apply the instrumentality of interstate commerce standard).

The government therefore must prove that each wire at issue, which occurred on a particular date, crossed state lines on that date. That necessarily requires a showing of where the parties were located, and if the parties are located in the same state, proof that the wire traveled out of state on its way from one to the other. A number of courts have also concluded that there is a presumption that wires or communications are intrastate when all parties to the communication are in the same state. *See, e.g.*, DeFazio v. Wallis, 500 F.Supp.2d 197 (E.D.N.Y. 2007); *cf.* Meier v. Musberger, 588 F. Supp. 2d 883 (N.D. Ill. 2008) (collecting cases).

In the present case, a legal presumption should be applied that wires sent and received by persons within the same state are intrastate rather than interstate. Even without applying that presumption, however, the government failed to prove that a number of the wires at issue in the wire fraud counts crossed state lines.

8

Count 2 is premised on an April 18, 2016 text, Count 3 is premised on an April 21, 2016 email, and Count 7 is premised on a December 8, 2016 text, all of which were between Messrs. Beck and Barfield. The government introduced no evidence of where the parties were located on these dates other than having introduced testimony that Mr. Barfield had moved to Florida in late January, 2016. On cross examination, however, Mr. Barfield testified that he received a number of the text messages from Mr. Beck when he was in Georgia, rather than in Florida. The government failed to carry its burden of proof.

Count 8 is a July 2, 2017 email from Mr. Beck to Steve McKaig (Govt. Exhibit 569), and Count 11 is an October 25, 2017 email from Mr. Beck to Sonya and Steve McKaig (Govt. Exhibit 570). The government introduced no evidence establishing that, on the date these emails were sent, Mr. Beck and the McKaigs were in different states. The testimony established that the McKaigs lived in North Carolina, but also that the McKaigs traveled to Georgia during this same time period. The government offered no evidence whatsoever indicating where these individuals were located on July 2, 2017 or October 25, 2017. The government also offered no evidence establishing that the emails would have had to cross state lines.

Accordingly, Defendant is entitled to dismissal of these wire fraud counts. Because the government has alleged that money laundering Count 32 is premised on wire fraud Count 7, Count 32 should also be dismissed as well.

(3)     <u>Count 25 Was Not In Furtherance of the Alleged Scheme to Defraud GUA</u> The Court should acquit Mr. Beck on Count 25 because the government failed to offer sufficient evidence to prove that the mailing sent by Georgia Arson Control Program, Inc. ("GACP") to the Adventures in Advertising Corporation ("AIA"), which allegedly included a check from GACP to AIA to pay for signs for Mr. Beck's campaign for Insurance Commissioner, was in furtherance of the scheme alleged in the Indictment, which was to defraud <u>the Georgia Underwriting Association</u>. *See* Indictment ¶ 1 (alleging that Mr. Beck devised a scheme "<u>to defraud the Georgia Underwriting Association</u>," and making no allegation that Mr. Beck devised a scheme to defraud GACP) (emphasis added).

The testimony that the prosecution's questions elicited from GUA employees and others failed to establish any kind of corporate link between GUA and GACP, much less a link that would somehow support the conclusion that conduct designed to obtain a check from GACP was somehow in support of a scheme to defraud GUA. Josh Mosley, who has served as acting general manager of GUA, testified that GACP is a separate legal entity from GUA, with separate boards of directors,

and that they "do separate things." In addition, the government questioned auditor Scott Barnett about Exhibit 421, an audit report which concluded that the finances of GACP and GUA should not be consolidated in part because "GACP and GUA are two separate entities." The report also reasoned that GUA and its management have no control over the decision[s] made by GACP and GUA affiliates have no equity interest in GACP.

The evidence elicited by the government therefore demonstrated that GUA and GACP are separate legal entities. The government thus failed to prove an that the mailing was done in furtherance of a scheme to defraud GUA. The Court therefore must acquit Mr. Beck on Count 25.

(4)    Defendant is Entitled to a Judgment of Acquittal on the Money Laundering Counts. The Court should acquit Mr. Beck on the money laundering charges in Counts 26-39 because these counts are premised on the mail and wire fraud charge cited in the Indictment, and Mr. Beck is entitled to a judgment of acquittal on the fraud counts for the reasons stated herein. In addition, the money laundering counts merge into those counts.

A.    Legal Standards - Money Laundering. Counts 26 through 39 charge Mr. Beck with violations of 18 U.S.C. § 1957. That statute criminalizes knowingly engaging in a monetary transaction (i.e., deposits) in "criminally derived property .

11

. . from specified unlawful activity," which means "property constituting, or derived from, proceeds obtained from a criminal offense . . . ." 18 U.S.C. § 1957. In this case, the Indictment alleges that the scheme to defraud set out in the wire and mail fraud counts is the specified unlawful activity that produced the proceeds that were then deposited by Mr. Beck as set out in the money laundering counts.

B.   <u>Legal Standards - Merger</u>. In order to prove money laundering, the government must establish that a defendant engaged in a financial transaction with the "proceeds" of a previous criminal act. That necessarily means that, if the underlying predicate act is not complete on the date the financial transaction occurs, that transaction cannot support a money laundering transaction, because it is does not involve the proceeds of a previous crime.

It is well-established that, "[b]ecause money laundering is an offense to be punished separately from the underlying criminal offense, it cannot occur until after the predicate crime becomes a 'completed offense." <u>United States v. Gross</u>, 661 Fed. App'x. 1007, 1021 (11th Cir. 2016) (per curiam) (citations and punctuation omitted); *see also* <u>United States v. Nolan</u>, 223 F.3d 1311, 1315 (11th Cir. 2000); <u>United States v. Gregg</u>, 179 F.3d 1312 (11th Cir. 1999). In <u>United States v. Gray</u>, 367 F.3d 1263, 1269 (11th Cir. 2004), the court noted that mail fraud is

completed on the date in which the defendant, depending on the use of mails charged in the indictment, deposits something in the mail.

C.     <u>The Money Laundering Charges Merge into the Fraud Counts</u>. The Court should enter a judgment of acquittal on the money laundering charges because they merge into the fraud charges. On this issue, Mr. Beck respectfully requests that they merge under two alternate theories / arguments.

(i)     <u>Merger Argument #1</u>. A fundamental and contentious question in the law is how merger should be treated in the context of an alleged scheme to defraud that involves multiple mailings and wires, all of which are designed to further the single, integrated goal of obtaining funds from the victim and putting those funds under the exclusive control of the defendant. <u>Cf</u>. <u>United States v. Waddell</u>, 840 Fed. Appx. 421, 442 (11th Cir. 2020) (highlighting that a fraudulent scheme reaches "fruition" when the defendant obtains "exclusive control of the fraudulently obtained funds"). Based both on the purposes underlying the money laundering statutes and the constitutional double jeopardy and due process concerns that inform the merger doctrine, the government should not be allowed to proceed, as it has here, by basing money laundering charges on intermediate deposits that occur along the way to getting the funds into the defendant's exclusive control. To the contrary, the government should only be allowed to base

money laundering charges on financial transactions that are engaged by the defendant after the scheme has reached fruition and he has obtained exclusive control over the funds.

Section 1957 is commonly referred to as the "spending statute," because its purpose is to make the criminal's money worthless by making it a felony just to spend it. In order for the defendant to spend it, of course, the defendant must have exclusive control over it. As noted above, where the money laundering statute has a proceeds requirement, like here, the government must show that the defendant (1) acquired the proceeds of specified unlawful activity and then (2) engaged in a money laundering transaction with those proceeds. In other words, the money laundering offense must be separate and distinct from the underlying offense as alleged in the indictment that generated the money to be laundered. The laundering of funds cannot occur in the same transaction through which those funds become tainted by crime. In analyzing this issue, cases look at the government's theory of the case as set out in the indictment and in the proof at trial. *See* United States v. Carman, 186 F. Supp. 3d 657, 670–71 (E.D. Ky. 2016), *aff'd sub nom.* United States v. Maddux, 917 F.3d 437 (6th Cir. 2019).

In an unpublished opinion, the Eleventh Circuit has held that, when a case involves a scheme with multiple predicate offenses, "it is sufficient that a portion

or phase of the scheme had been completed and had produced the proceeds used in the subsequent transaction." Gross, 661 Fed. App'x. at 1023. Supreme Court Justices Alito and Breyer, however, have highlighted the sort of merger problems that arise when the government contends that the "specified unlawful activity" supporting money laundering charges is separate mailings or wires forming intermediate steps in the fraud, as opposed to the scheme as a whole:

> Whenever a money laundering indictment charges that the laundered funds derived from an "unlawful activity" that comprehends numerous acts that occurred over a considerable period of time - and that is precisely the situation in many of the types of cases that the money laundering statute principally targeted - the plurality opinion's interpretation will produce difficulties. I have already discussed drug and gambling cases, and similar problems will arise in cases in which the unlawful activity is a form of fraud. For example, the unlawful activity in mail fraud (18 U.S.C. § 1341) is the scheme to defraud, not the individual mailings carried out in furtherance of the scheme. See Neder v. United States, 527 U.S. 1, 19, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999); United States v. Mankarious, 151 F.3d 694 (CA7 1998). In such a case, what will constitute the "single instance of unlawful activity"? Will each mailing be a separate "instance"? The same problem arises with other fraud predicates, including wire fraud (§ 1343), see, e.g., United States v. Zvi, 168 F.3d 49 (CA2 1999), and financial institution fraud (§ 1344), see, e.g., United States v. Farr, 69 F.3d 545 1995 WL 638249 (CA9 1995) (unpublished).

United States v. Santos, 553 U.S. 507, 544-45 (2008) (Alito, J., dissenting) (joined by Justice Breyer) (emphasis added), superseded by statute.

This problem is clearly implicated by the way the government has charged the various offenses here. Every one of the money laundering charges focuses on a

transaction that was described as part of the fraudulent scheme, and that undertaken in order to get the funds to the defendant and under his exclusive control. Some counts focus on deposits into the Green Tech account, and others focus on deposits into the accounts for the Georgia Christian Coalition and Creative Consultants. None of these charges focused on transactions after the defendant obtained exclusive control of the funds.

To state it succinctly, the money laundering charges in the Indictment conflate the act of fraudulently obtaining money via the conduct of the alleged scheme with the act of spending the money—two different activities which rarely, if ever, are one and the same. See United States v. Seward, 272 F.3d 831, 836 (7th Cir. 2001) (the "transaction or transactions that created the criminally-derived proceeds must be distinct from the money-laundering transaction"); United States v. Mankarious, 151 F.3d 694, 705 (7th Cir. 1998) ("Money laundering criminalizes a transaction in proceeds, not the transaction that creates the proceeds.").

The Indictment does cite transactions that could have been more logically charged under Section 1957. Specifically, the Indictment makes a point of citing Defendant's alleged spending of the proceeds of the scheme, alleging as follows:

> BECK utilized the proceeds of the above-described fraud schemes for a variety of purposes. These purposes included paying thousands of dollars of personal expenses charged to a personal credit card and using thousands of dollars to fund personal investment and retirement

> accounts, personal savings accounts, and the "Jim Beck For Georgia,
> Inc." statewide election campaign account. BECK also utilized . . .
> proceeds to purchase and improve personal rental property and to pay
> his personal state and federal income taxes.

Indictment ¶ 24. These are the sorts of transactions which one would expect to see

charged under Section 1957: monetary transactions allegedly engaged in by the

defendant after he obtained exclusive control over the funds. Instead, the money

laundering counts in the Indictment instead all focus on intermediate financial

transactions which were an integral part of the scheme to defraud.

A comparison of the financial transactions alleged as part of the fraud

scheme with the financial transactions alleged as the money laundering charges

raises a traditional merger issue. To cite just a few of many examples, in describing

the alleged fraudulent scheme paragraph 14 of the Indictment notes that part of the

scheme involved obtaining funds from GUA through Lucca Lu, and then paying

those funds to Green Tech. But Counts 29 and 33 then cite that same activity, and

those very deposits, as money laundering charges. Similar overlap exists in

paragraph 15 (fraudulent scheme) and money laundering Counts 32, 34 & 36;

paragraph 16 (fraudulent scheme) and money laundering Counts 26 & 35; etc.

Similarly, paragraph 19 of the Indictment notes that the fraudulent scheme

involved Green Tech paying Creative Consultants, but Counts 28, 30 and 37-39

base money laundering charges on that very same activity.

While the Eleventh Circuit held in <u>United States v. Silvestri</u>, 409 F.3d 1311 (11th Cir. 2005) that a defendant may be held liable for money laundering for depositing checks that had previously been mailed to him because the predicate mail fraud offense was completed when the mailing was done (the "receipt and deposit" concept of money laundering), the court did not directly address the question posed here, which is whether the government may premise money laundering charges on transactions that, as here, it has also alleged form an integral part of the fraudulent scheme. Defendant respectfully submits that, given the way that the government has alleged the fraudulent scheme in the Indictment, the money laundering charges merge into the fraud counts, and Defendant is entitled to a judgment of acquittal.

(ii)     <u>Merger Argument #2</u>. As noted above, in an unpublished opinion the Eleventh Circuit has noted that, when a case involves a scheme with multiple predicate offenses, "it is sufficient that a portion or phase of the scheme had been completed and had produced the proceeds used in the subsequent transaction." <u>Gross</u>, 661 Fed. App'x. at 1023. If this principle is applied in this case, then a number of the money laundering counts still merge into the fraud counts.

The Indictment alleges that the money laundering proceeds in this case were "derived from a specified unlawful activity, that is mail and wire fraud."

Indictment ¶ 32. In other words, the money laundering charges were premised on the fraud charges set out in the Indictment. This is confirmed not only by the Indictment, but also by the parties joint proposed jury instructions. *See* Combined Proposed Jury Instruction No. 22 (Money Laundering - 18 U.S.C. § 1957) (noting that the government must prove that "the property was in fact proceeds of wire fraud and mail fraud as alleged in the indictment . . . .").

During its presentation of the evidence to the jury, the government linked up each money laundering count in the Indictment to a specific mail or wire fraud count. For each money laundering count, the prosecutor stated that that count was "related to" a particular wire or mail fraud count. For example, in his presentation of the evidence for wire fraud Count 7, the prosecutor advised the Court and jury that this count was "related to money laundering Count 32." The clear import of this comment is that Count 32 is based on the deposit of proceeds of the wire fraud alleged committed in Count 7. The necessary implication of this reasoning is that, if a given money laundering charge is based on the deposit of an underlying wire or mail fraud count on which Mr. Beck is entitled to acquittal, then Mr. Beck is entitled to acquittal on that corresponding money laundering charge as well.

In a number of cases, the government has premised a money laundering charge on a deposit that occurred before the wire that relates to that charge. For

example, in a number of circumstances, the basis of the fraud charge is that Mr. Beck sent a wire or text to Mr. Barfield confirming that a check from GUA, Lucca Lu or Mitigating Solutions had been deposited into the Green Technology bank account at United Community Bank. In other words, the wire or mailing which forms the basis for the fraud charge occurred <u>after</u> the deposit which forms the basis for the money laundering charge linked to that fraud count. In that circumstance, the money laundering count must fail as a matter of law, because the underlying wire fraud charge upon which it is premised had not yet occurred at the time of the deposit. This applies to mail fraud Count 13, which is tied to money laundering Count 26; wire fraud Count 7, which is related to money laundering Count 32; wire fraud Count 9, which is related to money laundering Count 32; and wire fraud Count 10, which is related to money laundering Count 35.

Similarly, mail fraud Count 18 is premised on a Federal Express package allegedly sent on July 18, 2016, but which has a "Ship Date" of July 19, 2016. (Govt. Exhibits 803 & 514). Count 29 is a money laundering charge premised on the alleged deposit of a check on July 19, 2016. The government stated that Counts 18 & 29 are related. The government introduced a copy of the check (Govt. Exhibit 117), but it did not introduce a copy of the deposit slip. The back of the check lists the date July 19, 2016, but other evidence introduced at trial - specifically the

discussion of Exhibit 257 for money laundering charge 26 - demonstrated that the date on the back of the UC check is the date the funds were credited, not the date of deposit. Accordingly, this check may well have been deposited on July 18, 2016, prior to the shipment of the FedEx package. The government failed to prove otherwise. As such, money laundering Count 29 fails.

(5)   <u>Tax Counts: Constructive Amendment</u>. In Counts 40-43, the government alleges that Defendant violated 26 U.S.C. § 7206(2) in connection with allegedly false and fraudulent tax returns. That statute requires that the government prove that the defendant did "knowingly aid and assist in, and procure, counsel, and advise" some other person in connection with the "preparation and presentation" of tax returns to the IRS. *Id.* As the Eleventh Circuit recently stated:

> To prove a violation of 26 U.S.C. § 7206(2), the government must show that the defendant (1) willfully and knowingly aided or assisted (2) in the preparation or filing of a federal income tax return (3) that contained false material statements.

<u>United States v. Senat</u>, <u>No. 20-10777</u>, 2021 U.S. App. LEXIS 17654, ___ Fed. App'x. ___ (11th Cir. June 14, 2021) (emphasis added).

The statutory reference to "aided or assisted" necessarily refers to some other third person. For that reason, the statute is known as the Internal Revenue Code's aiding and abetting provision. <u>United States v. Williams</u>, 644 F.2d 696, 701 (8th Cir. 1981) (citation omitted). It is used almost exclusively to prosecute tax

preparers. As a matter of course, indictments charging 7206(2) always mention the name of the taxpayer as the person that the defendant aided or assisted.

Courts have also recognized that "the 'willfully aiding, assisting, procuring, counseling, advising, or causing' language of § 7206(2) effectively incorporates into this statute the theory behind accomplice liability." One must aid or abet or procure someone else to commit an offense; one cannot aid or abet one's self. United States v. Martin, 747 F.2d 1404, 1407 (11th Cir.1984). It is for this reason that an indictment that alleges aiding and abetting is defective if it does not identify a principal or codefendant. *Id.* at 1407–08; United States v. Garcia–Paulin, 627 F.3d 127, 133–34 (5th Cir. 2010).

In this case, the government, which of course had control over the language in the Indictment, elected to identify the person(s) that Mr. Beck purportedly aided or assisted in the preparation of his returns solely by incorporating by reference the factual allegations set out in Paragraphs 1 through 24. *See* Indictment ¶ 33. Those allegations reference other individuals that trial testimony has confirmed are Matt Barfield, Steven Gradick, Sonya McKaig and Steve McKaig. Given that no other individuals are referenced in the tax charges in the Indictment, those individuals are the only ones to whom Mr. Beck could have aided, assisted, counseled, advised or procured to submit false or fraudulent 1040 returns to the Internal Revenue

Service. Stated differently, any proof, argument or jury instruction that Mr. Beck aided or assisted someone else would constructively amend the Superseding Indictment and would violate the defendant's due process rights.

In introducing evidence that a different person prepared and submitted to the IRS the defendant's tax returns, the government has constructively amended the indictment and/or caused a variance. The government also offered insufficient evidence - indeed no evidence - to prove that Defendant aided or assisted any of the persons named in the Indictment with the preparation or presentation of his tax returns. Defendant is therefore entitled to acquittal on the tax charges.

IV.   <u>Conclusion</u>. For the foregoing reasons, Defendant respectfully submits that he is entitled to a judgment of acquittal on the counts identified above. The government has failed to introduce evidence sufficient to convict Defendant on those Counts.

[signatures on next page]

Respectfully submitted this 19th day of July, 2021.

/s/ William H. Thomas Jr.
William H. Thomas, Jr.
The W.H. Thomas Firm, LLC
Georgia Bar No. # 706610
511 East Paces Ferry Road
Atlanta, GA 30305
bill@whthomasfirm.com
(404) 897-3523 (office)
(678) 965-1781 (fax)

/s/ Randy S. Chartash
Chartash Law, LLC
Georgia Bar No. 121760
3151 Maple Dr., NE
Atlanta, GA 30305
randy@chartashlaw.com
404-333-2423

/s/  Douglas Chalmers Jr.
Douglas Chalmers, Jr.
Chalmers & Adams, LLC
Georgia Bar No. 118742
5805 State Bridge Rd. #G77
Johns Creek, GA 30097
dchalmers@chalmersadams.com
770-630-5927 (office)
678-582-8911 (fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA    )
    )
v.    )
    )    CASE NO.  1:19-CR-184-MHC-JSA
JIM C. BECK    )
    )
    Defendant.    )

## CERTIFICATE OF SERVICE

I hereby certify that on this day I served a copy of the foregoing Defendant's

Motion for Judgment of Acquittal on all parties of record via the electronic filing

system ("ECF"). This Motion was prepared in Times New Roman 14-point font.

Dated:  July 19, 2021.


/s/  Douglas Chalmers Jr.
Douglas Chalmers, Jr.
Chalmers & Adams, LLC
Georgia Bar No. 118742
5805 State Bridge Rd. #G77
Johns Creek, GA 30097
dchalmers@chalmersadams.com
770-630-5927 (office)
678-582-8911 (fax)