IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Action No. |
| *v.* | |
| JIM C. BECK | 1:19-CR-184-MHC-JSA |

## Government's Sentencing Memorandum

The United States of America, by Kurt R. Erskine, Acting United States
Attorney, and Brent Alan Gray and Sekret T. Sneed, Assistant United States
Attorneys, for the Northern District of Georgia, files this memorandum in
anticipation of Defendant Beck's sentencing hearing scheduled before this Court
on October 12, 2021.

### 1. Relevant Procedural History

On July 22, 2021, after an eight-day trial, a jury convicted Beck on Counts One
through Four, Six through Eight, Eleven, Thirteen through Thirty-Three,  and
Thirty-Six through Forty-Three, of the forty-three count Superseding Indictment
charged in the above-referenced matter.  (Doc. 1).  A final Presentence
Investigative Report (PSR) was issued to the parties on September 13, 2021.
According to the PSR, Beck faces a custody guideline range of 108 – 135 months,
a fine guideline range of $30,000 to $5,402,597.32 (per 18 U.S.C. § 3571(d)), and a
special assessment of $3,700.  Unresolved guideline issues pertain to PSR ¶¶ 79,
86, 91, 92 & 100, 96, 97, and 101.

1

**2. The Government's Position on the Defendant's Objections to the PSR**

**A. Defendant's Objection to Amount of Restitution (¶ 79)**

The PSR calculates a total restitution amount of $2,865,271.94 to be paid to two different victims: (1) $2,506,877.94 GUA's insurer, Cincinnati Insurance Company, and (2) $358,394 the IRS.  Beck objects to the amount owed to Cincinnati Insurance Company, contending that he should receive offsets for legitimate work actually provided to GUA by Sonya McKaig, Steve McKaig and Marjorie Lane over the course of the scheme.  Beck also objects to the IRS's entitlement to restitution as a victim, essentially contending that Beck's only restitution to the IRS should be if the IRS were to impose penalties on him for his tax fraud.  The government recommends that the Court impose restitution on Beck as to both victims based on the PSR and evidence presented at trial.

**i.  Restitution as to Cincinnati Insurance Company**

Beck does not dispute that Cincinnati Insurance Company (Cincinnati) is entitled to restitution under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A.  Rather, Beck objects to the amount of the restitution, claiming that he is entitled to offsets for legitimate work performed by persons working for the entities he directed to be created to carry out his scheme.

Restitution is "based on the amount of loss actually caused by the defendant's conduct."  *United States v. Ruan*, 966 F.3d 1101, 1174 (11th Cir. 2020).  While the government has the burden to prove a "reasonable estimate" of the loss to the victim by a preponderance of the evidence, it is ultimately the defendant's burden to prove that he is entitled to an offset.  *See United States v. Bane*, 720 F.3d

818, 828-829 n. 10 (11th Cir. 2013) ("The defendant bears the burden to prove the value of any . . . goods or services he provided that he claims should not be included in the restitution amount"). *See also United States v. Foster*, 878 F.3d 1297, 1308 (11th Cir. 2018).

Here, the PSR calculates the restitution to Cincinnati as $2,506,877.94, which is the amount that Cincinnati paid to its insured, GUA. Any offset to this amount, however, is Beck's burden to prove. The government notes that, as Beck accurately detailed in his objections, Sonya McKaig and Steve McKaig each testified that they performed legitimate work for GUA under their respective companies, Lucca Lu, LLC and Mitigating Solutions, LLC. Thus, the government does not dispute that Beck is entitled to an offset for services legitimately provided to GUA by Lucca Lu and Mitigating Solutions.[1] However, Beck's contention that "work performed by Marjorie Lane and use of Telemate through Paperless Solutions" were "legitimate services" that also should be offset from any restitution order, (PSR, ¶ 79, at p. 19), has no basis in any evidence presented

---

[1] Based on the testimony of Sonya McKaig and Steve McKaig and other evidence presented at trial, including monthly itemized invoices from Lucca Lu to GUA, the government estimates that GUA paid invoices related to Sonya McKaig's actual work averaging approximately $2,000-$4,000 per month from approximately January 2016 to May 2018. Similarly, Steve McKaig's testimony at trial established that GUA paid invoice was paid a fee of $3,350 every two months from approximately November 2016 to June 2018 for his actual work. Thus, the government believes that an offset would be appropriate in that monetary range.

at trial.  In fact, the opposite was demonstrated at trial, that is, that Paperless Solutions never provided any legitimate services to GUA.

Steve Gradick, the owner of Paperless Solutions, testified at trial that he created Paperless Solutions at the behest of Beck who falsely told Gradick that the GUA Board of Directors wanted to donate money to the Georgia Christian Coalition through a third party.  Thus, as Gradick testified and exhibits of financial records showed at trial, the money GUA paid to Paperless Solutions flowed from GUA to Gradick and to GA Christian Coalition, which the evidence at trial showed was a sham company created by Beck.  There was no evidence at trial that Paperless Solutions paid Lane for work she performed for GUA. Gradick further testified that he never prepared an invoice for Paperless Solutions and that he had never seen an invoice to GUA for Paperless Solutions until the government presented the invoices to him during the investigation.

The government does not dispute that Lane performed work for GUA, but there was no evidence at trial that these services were paid by Paperless Solutions or any of the other entities.  Moreover, the only reference to Telemate as some type of service provided to GUA through Paperless Solutions was by Beck during his self-serving and contradictory testimony on direct examination and cross-examination, and otherwise not supported by any evidence at trial.

Because it is Beck's burden to establish any offset to restitution since a defendant "is in the best position to know the value of the legitimate goods or services provided to his victims," *Bane*, 720 F.3d at 828-829 (citing *United States v. Bryant*, 655 F.3d 232, 254 (3d Cir. 2011)), the government recommends that the

Court impose restitution consistent with any offset able to be proved by Beck at sentencing.

### ii. The PSR Correctly Calculates the Amount Owed to the IRS.

As reflected in the PSR, the tax loss to the IRS is $358,394.  (PSR, ¶¶ 24 & 55-57.)  Beck does not dispute the amount, but instead contends that the IRS should not be considered a victim for purposes of restitution because Beck's conviction for tax fraud under 26 U.S.C. § 7206(2) "is a civil matter that is outside the scope of the criminal case."  Courts have discretionary authority, however, to order restitution to the victim of an offense as a condition of supervised release, regardless of whether a defendant was convicted of an offense identified under the Mandatory Victims Restitution Act.  *See* 18 U.S.C. §§ 3583(d) & 3556.  Courts routinely impose restitution in cases involving tax offenses, including the tax offense for which that the trial jury convicted Beck.  *See, e.g., United States v. Jeune*, 2021 U.S. App. LEXIS 25102 (11th Cir. Aug. 23, 2021) (imposing restitution in the amount of the intended tax loss based on convictions for 26 U.S.C. § 7206(2), among others); *United States v. Roberts*, 464 Fed. Appx. 796, 802 (11th Cir. 2012) (imposing restitution in the amount of the tax loss arising from convictions for violations of 18 U.S.C. § 371 (conspiracy) and 26 U.S.C. 7206(2) (aiding and assisting the preparation and filing of false personal income tax returns)).  Beck does not cite any case law or authority in his objections for the proposition that the IRS should not be considered a victim for restitution purposes when a defendant is convicted of a tax offense.

Accordingly, the government recommends that the Court impose restitution on Beck to the IRS in the amount of $358,394.

**B.  Defendant's Objection to Obstruction of Justice Adjustment (¶ 86)**

After the final PSR was prepared, Beck's counsel emailed the probation officer and the government to raise an objection to the U.S.S.G. § 3C1.1 obstruction of justice enhancement found in ¶ 86 of the PSR.  The probation officer found that the evidence shows that Beck "repeatedly made false statements about the businesses he utilized to commit this fraudulent scheme and where the GUA funds went after GUA paid the bogus invoices."  (PSR ¶ 86).  Among Beck's statements that the probation officer found to be perjurious were these three outlandish tales: 1) Paperless Solutions was a legitimate business created to improve GUA's "e-communication efforts"; 2) over a period of years, Beck paid a man named Jerry Jordan "hundreds of thousands of dollars" in cash for legitimate "data mining" work that he performed for the benefit of GUA; and 3) that Beck kept only ten percent of the GUA money which ended up in his bank accounts ". . .when in reality, Beck kept almost all the money generated through the fraudulent invoicing scheme."  (Id.).  Although Beck objected to this enhancement, he did not dispute that a district court has the authority to increase a sentence when a preponderance of the evidence shows that a defendant intentionally took an action to obstruct an investigation or a prosecution.  The language of U.S.S.G. § 3C1.1 is clear:

"If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

While the government supports the probation officer's application of the two-level increase as a result of Beck's false trial testimony, this Court's analysis of the application of § 3C1.1 should actually begin at the investigation stage. During the trial, this Court and the jury heard incriminating evidence in two telephone calls between Beck and his government-witness cousin, Matthew Barfield.  Beck's statements made and recorded on December 18 and 19, 2019, are in many ways inconsistent with his own trial testimony but also offer clear evidence of his attempts influence Barfield before his FBI interview.   (Gov. Dem. Exs. (transcripts) 483, 485).

Within minutes of learning for the first time that the FBI was investigating Green Tech, Beck assured Barfield that there was nothing to worry about because Green Tech "did inspection work" and "did it for other states."  (Ex. 483-1).   He told Barfield that there was "nothing else" to it.  (Id.).   Beck went on to tell his cousin that "probably a dozen or so" people did contract work for Green Tech and that Lucca Lu was the company's part-time customer that paid Green Tech for third-party data. (Id at 3).   Then, with similar nonsense, Beck tried to convince Barfield that Lucca Lu "had to do" things with Green Tech's data that "required a specialty in terms of underwriting that, uh, they couldn't do

otherwise." (Id. at 4). Beck then accused the FBI of getting "stuff stirred up" even though "everybody knows what I did and everybody knows what you did, so I don't see what the problem is." (Id.). Nothing could have been farther from the truth. The trial evidence clearly showed that no one other than Beck knew about his scheme or Green Tech's role in the fraud.

But perhaps Beck's most egregious obstruction attempt during this first call was his advice to Barfield for his meeting the next day with the FBI agents. Beck urged Barfield to lie to the agents: ". . . I brought you an opportunity to, to, <u>to work, to gather data</u> and, and, you know, that's what you kinda were happy to, you know, to play a part of it and, and, that, you know, that was kinda the deal." (Id. at 4). Without a doubt, the trial evidence showed that neither Barfield nor Green Tech ever gathered any data for anyone and there was no evidence that Barfield ever wanted to do such a thing.

Beck's efforts to obstruct the FBI's investigation by lying to his own cousin continued during the next day's call with Barfield. (Ex. 485). During that call, he told Barfield that he loved him and that everything was on the up and up. (Id. at 2). He also reassured Barfield that Green Tech had subcontractors doing all the work that the FBI was asking Barfield about. (Id.). Finally, Beck falsely suggested to Barfield that the FBI could find all their answers by calling GUA. (Id.).

Beck's recorded statements to Barfield were clearly damaging but at his trial, during the prosecution stage of this case, Beck's lies got even more outrageous. The Supreme Court has defined perjury in this context as "false testimony

concerning a material matter with the willful intent to provide false testimony, rather than as result of confusion, mistake, or faulty memory."   *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).   But despite his false testimony, Beck argues that this Court must sustain his objection to the § 3C1.1 enhancement because of this Court's previous ruling in *United States v. Jonathan Greenhill aka Andy Greenhill*, 1:18-CR-00108-MHC.  During that sentencing on March 30, 2021, this Court expressed its understandable concern about enhancing the sentence of a defendant who chose to testify, "put up [his] story," and let a jury decide whether to believe him.[2]  (*Greenhill* Doc. 272-39).   In considering Greenhill's testimony, this Court expressed concern about evaluating a defendant's trial testimony that "was not entirely truthful" and having to decide which of a defendant's lies had been discredited by the jury.  (Id. at 39).   Beck also points out that this Court continued its consideration of Greenhill's possible obstruction enhancement by saying that a defendant's trial testimony must be more than simply perjurious, the testimony must require the government take additional] steps in response to the testimony which could include calling a rebuttal witness. (*Greenhill*, Doc. 272-39-40).  Although the government took no additional trial steps in response to Beck's obvious lies, the government respectfully submits that Beck's perjury was so obvious and egregious that it cannot be ignored by this Court and should not have been rebutted by the government.  In fact, it is difficult to imagine that a potential witness exists who could have been called to

---

[2] Without disclosing details of Greenhill's PSR here, it is clear that Greenhill's testimony was vastly more limited than Beck's. (*Greenhill* PSR ¶79).

9

rebut Beck's story.  As this Court allowed during the *Greenhill* sentencing, "a rare circumstance" may exist which would require that this Court "find that [a defendant] committed perjury."  (Id. at 42).   The government submits Beck's trial testimony is just such a circumstance.

Beck testified directly contrary to the testimony of all the government's witnesses and he flatly denied the factual elements that established his guilt of the offenses charged.  But there was so much more.  Beck did not simply advance a different interpretation of the facts.  He invented a complicated series of lies in his desperate effort to escape liability.  And, in doing so, he invented Jerry Jordan.

Barfield testified to many facts which were contrary to Beck's trial assertions.  But, perhaps most relevant in this context, was Barfield's testimony that Beck told him that 80% of the money that GUA paid to Green Tech would be sent to a man named Jerry Luquire for work he performed.  Barfield produced copies of ten invoices that he received from Beck that he believed backed up Beck's story.  Those invoices were admitted as evidence and each showed Luquire had been the one who was paid by Green Tech.  (Gov. Exs. 620, 622, 625, 627, 629, 631, 633, 635, 636, 639).  For example, Invoice Number 1, dated February 15, 2003, showed that Luquire accepted a cash payment of $3,861.00 for providing 132 "Survey Services." (Gov. Ex. 620).  According to Invoice Number 10, dated December 17, 2013, Luquire was paid $17,283.06 in cash for 182 "Inspections" and 1,524 "Data Scans." (Gov. Ex. 639).  Although, Barfield testified as to Beck's statements about Luquire, he never once mentioned, nor was he questioned about, Jerry Jordan.

Gia Browder, GUA's long-time assistant underwriting director, testified and named all the GUA employees and contractors who collected data for the GUA re-inspection program.  She did not name Beck or Jerry Jordan.  Browder testified that she would have known if anyone else was sending updated inspection information to GUA and was confident that there were no other sources. Browder also testified that, prior to the federal investigation, she had never heard of Green Tech or seen any inspection data at all from the company. Additionally, during Browder's testimony, the government admitted an email from GUA's director of underwriting, Brittany McGowan, written to Beck on September 22, 2016.  (Gov. Ex. 554).  The email detailed the reinspection program and its rate of progress. (Id.).  It contained no mention that data was being supplied by Green Tech or any other outside source.  The email said nothing at all about Beck bringing on anyone else to assist with the program.  Beck's reply to McGowan's email was "Sounds like a plan."  (Id.).  And Jerry Jordan's name was never mentioned during any part of Browder's testimony.

Jerry Luquire's son, Brace Luquire, also testified for the government.  He testified to three simple but important facts:  1) his father died in 2014 at the age of 75; 2) the "Jerry Luquire" handwriting on the Green Tech paid receipts was not his father's; and 3) his father had no experience with or interest in property inspections or data scans.   It was only after Brace Luquire testified and the government rested that Jerry Jordan's name was first mentioned.

In addition to flatly and repeatedly denying any criminal wrong-doing, Beck testified during his trial to the following specific information:

11

1) In approximately September 2012, Jerry Luquire, who "never met a stranger," coincidentally met Jerry Jordan, a computer programmer, in a restaurant when another person called out the name "Jerry." And that very day, or the next, Luquire was "so excited" that he called Beck to tell him about Jordan and Jordan's ability to help Beck with his data mining plan.

2) Beck did not know the whereabouts of Jordan but, in the two years between his indictment and the trial, Beck tried unsuccessfully to locate him.

3) Jordan almost immediately began working for Beck but insisted that he must paid in cash.  For the next five years, the vast majority (60-80%) of the payments that Beck secretly received from GUA through Green Tech and Creative Consultants were actually paid to Jordan from Beck's hoard of cash.

4) Jordan had a "team" of people working on Beck's data mining project.  But during the two years between his indictment and trial, Beck was unable to locate any of Jordan's team members.

5) Beck knew of no one who could explain Jordan's "scrubbing" software or Jordan's ability to "bump up against" the GUA computer system.

6) Beck was unable to identify any of the GUA temporary workers who assisted Jordan and his team in their efforts to help with GUA's reinspection program.

7) Beck was unable to identify or produce a single example of Jordan's "data mining" software or any specific result from the use of Jordan's software.

8)  Despite responding to a federal grand jury with thousands of documents from Creative Consultants and GA Christian Coalition, Beck admitted that the name "Jerry Jordan" was never mentioned in any of the documents.

9)  Within a month of his first contact with Jordan, Beck and Jordan decided to test Jordan's new "robust scrubbing program."  They tested the program on real estate properties in Fulton and Dekalb counties but he had no proof of such tests.

10) Beck consulted with Cody Locklear about developing a scrubbing program before he met Jordan.  Locklear, however, never mentioned anything about such a program during any part of his trial testimony.

11) Beck did not know if Jordan's program had a name because they just referred to it as "the Green Tech program."

12) During the course of his work with Jordan, Beck and Jerry Luquire (who Beck testified could not turn on a computer) met Jordan in a restaurant in LaGrange, Georgia.  There, Jordan gave Beck a laptop which Jordan instructed could not be "used on any other network" in order to avoid malware.

13) Beck used a "flash drive" and Jordan's laptop to upload GUA customer information.  Jordan then uploaded "return product" that Beck would "pull down" from a shared file server.

14) Beck had no proof of the existence of the laptop, flash drive, or Jordan's file server because it was "eight years ago."

13

15) Jordan told Beck that his software business was incorporated and that it was named G-A-A-L (hesitantly spelled out rather than pronounced by Beck from the witness stand) and Beck was unsure whether the corporation was called GAAL Solutions or GAAL Services.

16) Beck tried unsuccessfully to locate Jordan's corporation by searching the secretary of state records for both Georgia and Alabama.  He also looked for the corporation in Colorado and Utah.

17) Beck last heard from Jordan around Christmas, 2017.  Jordan told Beck he was heading "out west" after meeting a woman online who was from Salt Lake City.

18) Beck never received a business card or any paper correspondence from Jordan and could not produce a single email either to or from Jordan.

19) Beck never had any intention of telling anyone at GUA about his connection to Green Tech because to do so would have been meaningless.

20) Beck insisted that he told GUA Chairman John Houser that he had a personal financial interest in a GUA vendor that increased the revenue at GUA by more than $2 million.  Houser testified that Beck never told him any such thing.

21) Although Beck had a financial interest in one of GUA's significant vendors, he denied any knowledge of a related-party transaction during a corporate audit only because he did not understand the auditor's question.

22) Beck never explained his connection with Green Tech to Sonya McKaig because he believed it was "not relevant."

23) Beck admitted that during Green Tech's first year of operation in 2013, the company paid him more than $108,000. Beck paid 80% of that amount ($86,400) in cash to Jordan but had no documentation of any of those payments.

24) Beck claimed no business expense on his 2013 Creative Consultant Schedule C that correlated to the alleged $86,400 payment to Jordan. But Beck explained that a $10,760 advertising expense was "mostly" attributable to part of Jordan's earnings and claimed car and management expenses also helped account for his payment to Jordan.

25) Beck admitted that there was nothing on any of his federal tax returns to show that he ever paid Jordan anything. Further, Beck testified that in 2013 he, dba Creative Consultants, paid more than $59,000 in taxes but intentionally did not deduct approximately $30,000 in payments to Jordan.

26) After Beck admitted that he intentionally misrepresented himself as Barfield in emails, he repeatedly said that the emails were "not fraudulent" and that he was not pretending to be Barfield. Beck also testified that he was "amazed" that the emails would be a subject of cross-examination.

This list of lies is by no means an exhaustive one. Over the course of two days, Beck's trial testimony was extraordinarily perjurious and more than deserving of an obstruction enhancement. In fact, it would probably be easier for the government and this Court to list his truthful statements. The Eleventh Circuit has held that when a district court finds that a defendant's testimony amounts to "a concoction," it supports a finding that "the defendant intended to

testify falsely, without confusion, about material matters" and merits the two-level enhancement of § 3C1.1.  *United States v. Lewis*, 115 F.3d 1531, 1538 (11th Cir. 1997).   In 2003, the Eleventh Circuit considered a Northern District of Georgia wire fraud conviction and the district court's refusal to apply a § 3C1.1 enhancement after evidence showed that the two defendants testified falsely during their trial.  *United States v. Poirier*, 321 F.3d 1024, 1035-36 (11th Cir 2003).  In remanding the case for resentencing, the appellate court ordered the district court to apply the obstruction enhancement after it found that the record showed the defendant "provided false testimony at trial and stubbornly maintained his incredible testimony that the money he received was for legitimate, unrelated consulting engagements."  (Id. at 1036).   The Eleventh Circuit continued by saying: "We are left with the definite and firm conviction that the sentencing court should have applied the enhancement for obstruction of justice to the defendants.  Its inexplicable finding that the defendants did not obstruct justice is clearly erroneous, and must be corrected on remand."   In *United States v. Geffrard*, 87 F.3d 448, 453 (11th Cir. 1998), the Eleventh Circuit upheld the application of an obstruction enhancement after holding that the defendant's "denials, poor recollection, and false testimony [] in light of all the credible evidence to the contrary easily justified the perjury findings of the district judge."  According to *Geffrard*, the defendant earned the enhancement because one of the important claims to his defense was "shown to be transparently false."  (Id. at 453).  *See also United States v. Morales De Carty*, 300 F.App'x 820, 831032 (11th Cir. 2008) (obstruction enhancement warranted where the defendant's testimony was

16

inconsistent with the jury's verdict and was contradicted by other trial evidence); *United States v. Johnson*, 302 F3d 139, 154 (2d Cir. 2002) (obstruction enhancement warranted "[b]ecause several positions of Johnson's sworn testimony at trial were irreconcilably inconsistent with the jury's verdict."). When this Court considers the totality of Beck's testimony, it is hard to imagine a scenario where a defendant's testimony could be more stubbornly incredible or transparently false. Throughout his testimony, there were constant examples of false statements but it is sufficient, and perhaps even more appropriate here, for this Court to make a general finding that the whole of Beck's testimony encompassed all the factual predicates of perjury. *United States v. Diaz*, 190 F.3d 1247, 1256 (11th Cir. 1999) (*citing United States v. Arguedas*, 86 F.3d 1054, 1059 (11th Cir. 1996) and *Dunnigan* at 94.

### C. Defendant's Objection to Abuse of Trust Adjustment (¶ 91)

Pursuant to U.S.S.G. § 3B1.3, the probation officer added two levels to Beck's adjusted offense level for his conviction on money laundering. (PSR ¶ 91). She points out that Beck's position "as General Manager of Operations at GUA allowed Beck to continue and conceal the money laundering scheme." Beck argues that the probation officer used the same conduct for this adjustment as she used for the abuse of trust adjustment for the wire and mail fraud counts (PSR ¶ 85) and that it is inapplicable to the money laundering accounts.

The probation officer correctly added this abuse of trust adjustment to Beck's offense level for his money laundering convictions. Under federal law, the offense of money laundering necessarily requires that a defendant have been

personally involved in a monetary transaction.  The statute defines a monetary transaction to include a bank deposit. 18 U.S.C. 1957(f)(1).  Among the acts of money laundering for which Beck was convicted, was his deposit on February 1, 2016 of a GUA check for $24,928.60 into the Green Tech bank account at United Community Bank.  (Doc. 22, Count 26).   At trial, evidence clearly showed that Beck, acting in his capacity as general manager of GUA, routinely instructed that GUA checks to Green Tech be delivered to the company's front desk rather than placed in the mail as would otherwise have been the routine.  Evidence further showed that Beck would pick up those GUA checks and then personally deposit them into the Green Tech bank account.  It was only by virtue of his position at GUA that Beck was able to manipulate GUA's normal bill-paying routine.

Further, Beck was convicted of personally depositing two Lucca Lu checks, both for $28,700.00, into the Green Tech bank account on July 19, 2016 and December 20, 2016 and doing the same with two Mitigating Solutions checks, both for $33,500.00, on December 8, 2016 and August 22, 2017.  (Id., Counts 29, 32, 33, and 34).  Again, Beck was only in possession of these checks because of his position at GUA.  At trial, Sonya McKaig testified that, pursuant to Beck's instructions, she sent the Lucca Lu to Green Tech checks via overnight mail to Beck at his GUA address. (See Gov. Ex. 551).  According Sonya McKaig, Beck told her to send the checks to his assistant but to mark the envelope containing the Green Tech check as "personal and confidential."  Sonya McKaig also testified that she believed that she was sending those checks to Beck because he

18

was "a hands-on manager" who wanted to make sure the payment got to Green Tech as soon as possible.

Similarly, Steve McKaig testified that Beck told him that Mitigating Solutions was paying Green Tech for reinsurance premiums and that he should always send those checks via FedEx to Beck's attention at GUA and in care of Beck's secretary.   In these instances of money laundering, the evidence shows that Beck abused his fiduciary position of trust at GUA in order to obtain the fraudulent checks and personally deposit the funds.

### D. Defendant's Objection to Obstruction of Justice Adjustment (¶¶ 92 & 100)

Although Beck will likely make his previous *Greenhill* argument to support these objections, he originally objected here for different reasons.  In his objection to ¶ 92, Beck argued that this enhancement should be removed because the PSR had already ". . . considered the defendant's obstruction of justice as it relates to the underlying scheme [presumably, wire fraud and mail fraud] but not the money laundering offense." (PSR ¶ 92).  Similarly, in his objection to ¶ 100, Beck argued that the probation officer used Beck's false testimony about the wire fraud and mail fraud counts to apply the obstruction to the tax counts.  (PSR ¶ 100).

It is abundantly clear that Beck's insistence that GUA was spending millions of dollars for legitimate services provided through Green Tech, Lucca Lu, Mitigating Solutions, and Paperless Solutions was just a ridiculous story.  And like his attempts to explain away the wire fraud and mail fraud allegations, Beck

lied about his money laundering and tax fraud, too.  For example, on direct examination Beck explained that he shipped GUA checks to Sonya McKaig in response to her sending GUA an "aggregate" invoice which included legitimate charges for services provided by Green Tech and Lucca Lu.  Beck sent GUA checks to Sonya McKaig so she would, in turn, "cut a check to Green Tech" and ship it to him at GUA.  According to Beck, it was those Green Tech checks that he would deposit into Barfield's account at United Community Bank (charged as money laundering in Counts 29 and 33).  As part of that explanation, Beck told the jury that he always wanted to personally inspect the checks to have "another opportunity to verify the lift" and justify the expenses to GUA.

In defending the tax fraud allegations, Beck went beyond his contorted explanation of his 2013 tax return.  On direct examination, Beck testified that: 1) although he was unable to produce any receipts for the business expenses that he claimed, Beck "certainly had them" when his taxes were prepared; 2) Beck's tax preparer, Clifford Entrekin,  erroneously described the legitimate deductions that Beck was due; 3) a $30,000 phone expense was inaccurate as entered by Entrekin because the correct expense amount had been on a line "right or above or below" on a spreadsheet; and 4) there was nothing intentionally inaccurate on any of his subject tax returns.

### E. Defendant's Objection to Pattern/Scheme Substantial Income Adjustment (¶ 96)

The PSR correctly added two levels to the base offense level for Group C, tax conduct, under U.S.S.G. § 2T1.4(b)(1)(A) because the offense was committed "as

part of a pattern or scheme from which he derived a substantial portion of his income."  (PSR ¶ 96.)  Beck objects on the grounds that this enhancement should be limited to situations where a defendant –in Beck's view, a tax preparer-- derives a substantial portion of income from a "a tax fraud scheme."  There are no such limitations noted in the Sentencing Guidelines.  As the PSR correctly notes, the pattern and scheme at issue is the overall fraud that generated the massive amount of income, which Beck then deducted through creative and fictitious business expenses, leading to the tax loss.  The pattern and scheme must necessarily encompass how Beck came to possess such income because without Beck's scheme to steal money from his employer, Beck would not have had such massive income to deduct in the first place.  To only hold Beck accountable for his "scheme" to falsely state his business deductions would obviate any need for language referencing a "pattern or scheme" since the guideline would just reference the "offense conduct" as in other sections of the guidelines, such as U.S.S.G. §§ 2B1.1 or 2K2.1.  Beck points to the Application Note's use of the example of "promoting fraudulent tax shelters," but the Application Note also does not express that this is the only possible example that would qualify under this enhancement.

Given that the pattern or scheme should apply to the entirety of Beck's conduct, it cannot be reasonably disputed that Beck derived a substantial portion of his income from this pattern or scheme.  As the government showed at trial, through the testimony of FBI Special Agent Ashley Tucker and Barfield and various exhibits, including copies of checks and bank statements, over a five year

period, Beck diverted over $2 million through his fictitious entities, Creative Consultants and GA Christian Coalition, as well as hundreds of thousands of dollars of cash withdrawn from Green Tech's bank account, while his legitimate earnings were approximately $120,000 to $200,000 per year as the General Manager of GUA from 2012 through 2019, (PSR, ¶ 139), as well as some rental income.  (PSR, at p. 34.)

Beck ultimately bases his objection to this enhancement on his characterization of 26 U.S.C. § 7206(2) as a statute that should only be used to prosecute tax preparers.  In other words, Beck advances the same argument that this court rejected in denying the motion for acquittal.  Despite Beck's insistence that 26 U.S.C. § 7206(2) should only apply to tax preparers, other courts have upheld convictions of non-tax preparers like Beck, who aided and assisted in the filing of false and fraudulent tax returns.  *See, e.g., United States v. Donaldson*, 767 Fed. Appx. 903 (11th Cir. 2019) (affirming 26 U.S.C. § 7206(2) conviction where defendants created, marketed and administered fraudulent tax shelter that led to the filing of materially false tax returns by others ); *United States v. Miller*, No. 14-1122, 595 Fed. Appx. 166 (3d Cir. 2014) (affirming 26 U.S.C. § 7206(2) conviction where defendant, a CEO of a hospital, gave false information regarding his income to his tax preparer); *United States v. Bennallack*, No. 95-10532, 1996 U.S. App. LEXIS 33697 (9th Cir. Dec. 27, 1996) (upholding 26 U.S.C. § 7206(2) conviction where defendant paid employees in cash which he knew would result in false reporting on their taxes).  Accordingly, the PSR correctly applied the two-level enhancement to Beck's tax conduct under U.S.S.G. § 2T1.4(b)(1)(A).

**F.  Defendant's Objection to Sophisticated Means Adjustment (¶ 97)**

The probation officer determined that Beck used sophisticated means to commit tax fraud which resulted in a two-level enhancement pursuant to U.S.S.G §2T1.4(b)(2).  Beck objected by calling his tax fraud "basic and elemental" and "not especially complex or especially intricate offense conduct pertaining to the execution or concealment of the offense."[3] (PSR ¶ 97).  The government agrees with the probation officer's position and her conclusion that Beck, over a four-year period, intentionally and very specifically overstated his total business expenses by more than a million dollars.  (PSR ¶ 55).

Beck's certified federal tax returns for 2014, 2015, 2016, and 2017 were admitted as evidence at trial.  (Gov. Exhs. 290-293).  Each return included a detailed Schedule C for his sham entities, Creative Consultants and GA Christian Coalition.  (Id.).  On each Schedule C for Creative Consultants, Beck reported the income he fraudulently received from Green Tech. (Id.).  On each Schedule C for GA Christian Coalition, Beck reported the income he fraudulently received from Paperless Solutions.  (Id.).  But, in each instance, to offset the bogus income he reported, Beck created an elaborate list of fake business expenses.  For example, in 2014, the first year that Beck reported the income that he stole from GUA, he deducted the following expenses for Creative Consultants:  1) $6,459 for advertising; 2) $2,758 for contract labor; 3) $18,073 for outside services; 4) $3,210

---

[3] Beck's objection includes the following statement: "Mr. Beck deducted expenses on his tax returns without receipts to support those expenses."  That statement contradicts Beck's trial testimony.  Beck told the jury that he "certainly" had expense receipts when his taxes were prepared.

for printing; 5) $176 for publications; 6) $1,229 for telephone; and 7) $2,870 for internet fees.  (Gov. Exh. 290-50-53).  This pattern of deceit continued and grew substantially over the next several  years.  As the amount of stolen income increased, so did Beck's business expenses.[4]  By 2017, Beck's reported income for Creative Consultants, all of which came from GUA via Green Tech, was $ 482,220 offset by $208,841 in deducted expenses.  (Gov. Ex. 293-62, 65).  Those 2017 business expenses included: 1) $11,367 for advertising; 2) $5,346 for depreciation; 3) $1,750 for legal and professional services; 4) $33,141 for outside services; 5) $20,982 for clerical fees; 6) $19,426 for fuel; 7) $18,992 for web hosting fees; 8) $14,673 for printing; 9) $7,088 for telephone; 10) $2,558 for marketing; 11) $2,010 for publications; 12) $702 for bank charges; 13) $679 for security fees; and 13) $42 for postage.  (Id.).

The totality of Beck's tax fraud scheme merits the sophisticated means enhancement because, like the wire and mail fraud schemes he used to steal from GUA, Beck's efforts to cheat the IRS were long-standing and full of detail.  The Eleventh Circuit has repeatedly held that in order to determine whether the sophisticated means enhancement is applicable, a district court must look to a defendant's "conduct as a whole, not. . . each individual step," *United States v. Feaster*, 798 F.3d 1374, 1380 (11th Cir. 2015) (quoting *United States v. Moran*, 778 F.3d 942, 977 (11th Cir. 2015)), to determine whether the "totality of the

---

[4] In 2015, Beck reported Creative Consultants' income as $308,472 and claimed fraudulent itemized business expenses of $150,301.  (Gov. Ex. 291-57).  In 2016, Creative Consultants' income increased to $543,190 which was reduced by itemized business expenses of $200,203.  (Gov. Ex. 292-74).

[conduct]" sufficiently supports the application of the enhancement.  *Id. quoting United States v. Ghertler*, 605 F.3d 1256, 1268 (11th Cir. 2010).  *See also United States v. Barrington*, 648 F.3d 1178, 1199 (11th Cir. 2011) ("Each action by a defendant need not be sophisticated in order to support this enhancement."); *Moran*, 778 F.3d at at 977 (affirming imposition of sophisticated-means enhancement where defendants used widespread kickbacks and the falsification of group-therapy notes in committing healthcare fraud, even though the defendants did not employ any methods cited in the Application Note).

In *Ghertler*, the Eleventh Circuit considered conduct which involved a wire fraud scheme in which the defendant impersonated corporate officials to convince the victim companies to send money to him and to a third-party. *Ghertler* at 1260.  Despite Ghertler's protest that his offenses were not sufficiently complex or intricate, the district court applied a sophisticated means enhancement.  The *Ghertler* panel affirmed the enhancement holding that "[t]here is no requirement that each of the defendant's individual actions be sophisticated in order to impose the enhancement.  Rather, it is sufficient if the totality of the scheme was sophisticated."  The Court based its opinion, in part, on the fact that the defendant carried out his scheme over 18 months, which the Court called "an extended period of time." Id. at 1268.

Here, Beck's tax fraud scheme continued for at least four years and involved two separate financial entities, four separate tax returns, eight separate Schedule C forms, and 79 distinct and fraudulent claims of business expenses.  The totality of this tax fraud has earned a sophisticated means enhancement.

25

### G. Defendant's Objection to Multiple Count Adjustment (¶ 101)

The probation officer found that the fraud and tax offenses do not group under U.S.S.G. § 3D1.2(d) because the fraud and tax counts represent different harm and different victims.  (PSR ¶ 101).  Beck objected and made two arguments.  (Id.)  First, Beck argued that under U.S.S.G § 3D2.1(d), § 2T1.4 groups together with § 2B1.1.  (Id.).  Alternatively, Beck argued that even if the tax counts do not group with the other counts, when the guideline is properly calculated, the tax counts (Group C) are nine levels below Groups A and B resulting in a total units number of 1.0 which would not add to his offense level. (Id.).

The government agrees with the probation officer's position that Beck's tax convictions do not group with his wire and mail fraud convictions.  U.S.S.G. § 3D1.2 controls the grouping of closely related counts.  The section provides that only counts involving substantially the same harm may be grouped together. None of the circumstances set out in § 3D1.2 provide for grouping the tax fraud convictions with Beck's other fraud convictions.  The evidence produced at trial clearly shows his efforts to defraud the IRS not only involved a different victim but an altogether different harm brought about by a separate set of unrelated transactions.  *See United States v. Register*, 678 F.3d 1262, 1266 (11th Cir. 2012).

In reviewing a case from the Northern District of Georgia, the Eleventh Circuit addressed an argument remarkably similar to Beck's.  *United States v. Doxie*, 813 F.3d 1340 (11th Cir. 2016).  In *Doxie*, the defendant pleaded guilty to 21 counts of mail fraud, 41 counts of wire fraud and four counts of filing a false tax

return.  *Id*.  On appeal, Doxie argued that his sentence was procedurally unreasonable because the district court refused to group the wire and mail fraud counts with his four tax convictions.  *Id*. at 1342-43.  The Court determined that the district judge properly refused to group the counts noting that the majority of circuits to address this issue had concluded that fraud counts and tax offense counts involving the proceeds of the fraud should not be group together under § 3D1.1.  *Id*. at 1345.  The Court's conclusion perfectly applies to Beck's situation.  If this Court were to group all of Beck's tax convictions with his other fraud convictions, "there would [be] no additional punishment" for Beck's tax crimes so "the only way to achieve the stated goals of providing incremental punishment for additional crimes while preventing double counting for substantially the same conduct is to refuse to group the tax counts with the wire and mail fraud counts."  *Id*. at 1347.

//

//

//

### 3.  Government's Sentencing Recommendation

Based on the preceding arguments in support of the probation officer's guidelines calculations, the factual findings of the PSR, and the sentencing factors set forth in 18 U.S.C. § 3553(a), the government recommends that Defendant Beck be incarcerated for a term of 120 months.


Respectfully submitted,

KURT R. ERSKINE
    *Acting United States Attorney*


/s/BRENT ALAN GRAY
    *Assistant United States Attorney*
    Georgia Bar No. 155089
    brent.gray@usdoj.gov


/s/SEKRET T. SNEED
    *Assistant United States Attorney*
    Georgia Bar No. 252929
    sekret.sneed@usdoj.gov

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

October 5, 2021

/s/ SEKRET T. SNEED
SEKRET T. SNEED
*Assistant United States Attorney*